Filed 7/22/16  In re S.M. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re S.M., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>    Plaintiff,<br><br>v.<br><br>J.H.,<br><br>    Defendant and Respondent.<br><br>K.R.,<br><br>    Defendant and Appellant. | E064582<br><br>(Super.Ct.No. INJ1500246)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Susanne S. Cho, Judge.

Affirmed.

1

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff.

Amy Z. Tobin, under appointment by the Court of Appeal, for Defendant and Respondent.

Appellant K.R. (mother) appeals from the juvenile court's order, pursuant to Welfare and Institutions Code[1] section 361, removing her son, S.M. (the child), from her custody. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On July 31, 2015, the Riverside County Department of Public Social Services (DPSS) filed a section 300 petition on behalf of the child, who was one month old at the time. The petition alleged that the child came within the provisions of section 300, subdivision (b) (failure to protect). Specifically, it alleged that the alleged father, T.M., had an extensive substance abuse history and a drug-related criminal history. He was currently abusing controlled substances and was on probation for drug sales. The petition also alleged that T.M. had failed to make himself available to DPSS for further assessment, and he failed to engage in a substance abuse program. The petition alleged that mother minimized T.M.'s active substance abuse and allowed him to reside with and care for the child. The petition further alleged that another alleged father, J.H., was not a

---

[1] All further statutory references will be to the Welfare and Institutions Code, unless otherwise noted.

member of the child's household, and he had failed to provide the child with food, clothing, shelter, or any type of support.

The social worker filed a detention report and reported that the child came to DPSS's attention on June 29, 2015. The child was born drug free, but was admitted to the neonatal intensive care unit because mother had a fever at the time of his birth. Mother was noted to have a seizure disorder, slow speech, and memory problems. T.M., who was thought to be the child's father at the time, went to the hospital for a rash on June 28, 2015, and tested positive for methamphetamines, opiates, and tricyclates. T.M. was on probation for drug sales, and his use of illegal drugs was a violation of his probation. Mother reported that her husband, J.H., lived in Oklahoma and wanted a paternity test.

The social worker reported that the child lived with mother, T.M., and T.M.'s mother, L.S. The social worker went to the residence on July 7, 2015, and T.M. invited her in. Mother and the child were present. T.M. acknowledged using methamphetamines in the days before he went to the hospital, and also on July 4. He also said he had been using methamphetamines since he was 12 years old and that he had been through a number of treatment programs. The social worker also interviewed mother, who said she started living at L.S.'s residence in February 2015. She was aware of T.M.'s drug issues and thought he last used the week prior. L.S. was also aware that T.M. was using while residing in her home. The social worker expressed her concern with T.M. actively using methamphetamines and said she would be able to avoid immediate court action if T.M.

3

moved out of the home. T.M., L.S., and mother agreed and signed a safety plan to that effect. They also agreed to participate in the SafeCare program and have a nurse visit the home and offer information.

Subsequently, on July 20, 2015, a SafeCare nurse went to her first home visit and reported that T.M. was present. He was lethargic, but participated in the session. T.M. was also present at her next visit on July 24, 2015, and again participated in the session.

The social worker further reported that she spoke with mother's husband, J.H., on July 30, 2015. He said he had just become aware of the child's existence the day before. He was confident that he was the father and wanted custody of the child. He said mother was with him in Oklahoma, where he resided, in October 2014, and she went back to California on February 1, 2015, without telling him.

The court held a contested detention hearing on August 4, 2015. Mother, T.M., and J.H. were present. Counsel for J.H. argued that J.H. was the presumed father and requested for the court to allow him to testify. J.H. testified that he was a logistics specialist in the U.S. Army, and that he was stationed in Oklahoma. He was scheduled for deployment, but if he got custody of the child, he would not be deployed. He was in the process of moving into a three-bedroom house that had a full nursery set up for the child. J.H. also said the Army would provide extra money for childcare, with the option for a registered nurse to come to the house to check up on the child once a week. J.H. testified that he took mother to Oklahoma in October 2014, and then she suddenly left him one morning in February 2015. He did not know where she went. He tried to

4

contact her and find her, to no avail. Mother called him on July 29, 2015, to tell him the child was born. Prior to that, the only time he had spoken with her was Easter weekend, when she said she wanted a divorce. At the conclusion of J.H.'s testimony, his counsel argued that there was no prima facie showing that the child came under section 300 with regard to J.H., since he was a nonoffending, noncustodial parent. She asserted that the only allegation against him was that he failed to provide for the child; however, he was not even aware of the child's birth until July 29, 2015.

The court found that the child came within section 300, subdivision (b), with regard to T.M. and detained the child as to him. The court did not detain the child as to mother or J.H. and ordered him to remain in their custody, with mother as the primary custodian. The court ordered DNA testing.

On August 27, 2015, the social worker filed an amended section 300 petition. The petition added an allegation pursuant to section 300, subdivision (b), alleging that mother had a history of abusing methamphetamines and heroin, with her most recent use of methamphetamines on July 15, 2015.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on August 28, 2015, recommending that the court sustain the petition, declare the child a dependent, deny reunification services to T.M. (due to his extensive drug use and resistance to treatment), and order family maintenance services for mother and J.H. The social worker reported that mother was significantly impaired due to brain damage from a childhood illness.

5

Nonetheless, the social worker found her currently capable of parenting the child and benefitting from services, based on the support she received from L.S. The social worker noted that mother may not be capable of living independently. The social worker further reported that mother admitted to using methamphetamines and heroin with T.M. in the summer of 2014, and she experienced severe symptoms (vomiting, physical pain) consistent with heroin withdrawal. Mother admitted that on July 15, 2015, she accepted a "shotgun" from T.M., where he drew methamphetamine smoke into his mouth and blew it into her mouth.

In an addendum report filed on September 25, 2015, the social worker reported that the results of the paternity test showed that J.H. was the biological father of the child. The social worker continued to recommend family maintenance services for mother and J.H. (hereinafter, father).

The court held a contested jurisdiction/disposition hearing on October 1, 2015. At the outset, the parties agreed to have the court dismiss the allegations in the section 300 petition against T.M., since he was not the child's father. Counsel for father then argued that the allegation concerning father should also be stricken from the petition since he was not even aware the child was born until the day before the social worker contacted him. Counsel argued that father was not given the opportunity to provide the child with necessities, but once he was notified of the child's birth, he drove from Oklahoma to California to attend the hearings. Counsel further noted that father offered to help mother and T.M., but they refused his help. He concluded that father was the nonoffending

6

parent and was not the reason DPSS became involved. Since there was no evidence that father posed any harm to the child, he asked for custody and exit orders under section 361.2. The child's counsel agreed. The court indicated to county counsel that it intended to find that the allegation against father was not true, and county counsel submitted on that tentative decision.

Next, county counsel argued that there was no evidence to support a finding for the child to be removed from mother's custody. Father's counsel expressed concern, noting that mother suffered from short-term memory loss and was on social security for an epilepsy disorder. Moreover, the only identified support system was L.S., who worked and was not related to the child at all, since T.M. was not the father. Father's counsel questioned how long mother's living arrangement with L.S. would last if T.M. was no longer in the home and there was no relational connection with the child. Father's counsel also pointed out that T.M. had substance abuse issues, that mother not only condoned his use, but had used drugs with him in the past. Father, on the other hand, was more than willing and able to care for the child. He had several services available through the military. Counsel argued that the only safe and viable option was to give father sole physical custody and joint legal custody. The child's counsel wholeheartedly agreed with father's position. Mother's counsel asserted that mother was in a stable residence and that L.S. was devoted to helping mother. She also said T.M. was participating in a substance abuse program.

The court concluded there was clear and convincing evidence that there would be a substantial risk of detriment to the child if left in mother's custody. The court noted mother's admission that she used drugs with T.M. the previous year and that T.M. used methamphetamines less that one month after the child was born. The court specifically noted its concern with mother's health issues and her ability to independently care for the child. It also noted the fact that she was in a relationship with a man who was a severe drug addict, and she risked exposing the child to him. County counsel urged the court to consider the problems in the parents' relationship, the distance between the parents, and the child's young age. The court decided that, given the age of the child, it was in his best interest for mother to have six months of reunification services. It noted that DPSS could contact father by phone and email to obtain information about the child. DPSS then filed an amended petition to reflect the court's findings that day. The amended petition struck the allegations regarding T.M. and changed his identity to mother's boyfriend (rather than the child's father) in the allegation concerning mother. The court found true the allegations that mother minimized T.M.'s active substance abuse and allowed him to reside with and care for the child, and that mother had a history of abusing methamphetamines and heroin, with her most recent use of methamphetamines being on July 15, 2015. The court found the allegation regarding father to be not true. The court adjudged the child a dependent, removed the child from mother's custody under section 361, subdivision (c)(1), and gave physical custody of the child to father, subject to the court's supervision. The court found that reasonable efforts were made to

8

prevent or eliminate the need for removal of the child from mother's home.  The court

ordered mother to participate in reunification services.  The court further ordered DPSS

to ensure that mother had in-person visits with the child once a month.  Visits were to be

unsupervised, but T.M. was not to be near the child.  The court also authorized DPSS to

permit overnight or weekend visits, but not until a social worker "[was] satisfied that it

[was] okay to do so."  The court ordered Skype and telephone contact three times a week.

## ANALYSIS

### Substantial Evidence Supports the Court's Removal Order

Mother argues there was no clear and convincing evidence of a risk of serious

harm to the child that necessitated his removal from her care.[2]  We disagree.

A child may not be removed from a parent or guardian unless there is clear and

convincing evidence of "substantial danger to the physical health, safety, protection, or

physical or emotional well-being of the minor if the minor were returned home, and there

are no reasonable means by which the minor's physical health can be protected without

removing the minor from the minor's parent's or guardian's physical custody."  (§ 361,

subd. (c)(1).)  A juvenile court's removal order is reviewed under the substantial

evidence standard of review, notwithstanding the evidentiary standard used at trial.  (*In re

Heather A.* (1996) 52 Cal.App.4th 183, 193; see *In re E.B.* (2010) 184 Cal.App.4th 568,

---

[2]  We note that DPSS did not file a respondent's brief, since its position in the juvenile court was the same as mother's position on appeal.  It did not recommend removing the child from mother's custody.

9

578 ["The clear and convincing standard was adopted to guide the trial court; it is not a standard for appellate review. [Citation.] The substantial evidence rule applies no matter what the standard of proof at trial."].)

"In reviewing the sufficiency of the evidence on appeal, we consider the entire record to determine whether substantial evidence supports the juvenile court's findings. Evidence is '"[s]ubstantial"' if it is reasonable, credible and of solid value. [Citation.] We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary finding. [Citations.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) Our inquiry is thus limited to the question of whether the evidence would allow a reasonable trier of fact to make the findings required to support the challenged order. (See *In re Jasmon O.* (1994) 8 Cal.4th 398, 423.)

"The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, overruled on other grounds in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.) "In this regard, the court may consider the parent's past conduct as well as present circumstances." (*In re*

*Cole C.* (2009) 174 Cal.App.4th 900, 917; see *In re T.V.*, *supra*, 217 Cal.App.4th at p. 133 ["A parent's past conduct is a good predictor of future behavior."].)

In the present case, there was substantial evidence to support the juvenile court's finding that removal of the child from mother's custody was the only reasonable means to protect the child from harm. The juvenile court found that the child should be removed based on mother's health issues, including her short-term memory loss and epilepsy disorder and seizures. These conditions limited her ability to live independently. The court was concerned that mother's only support system was T.M.'s mother, L.S., with whom she lived. However, the stability of mother's living situation was questionable, since T.M. was not the child's father, and thus, L.S. was not related to the child. The court was also concerned with T.M.'s drug use and noted that mother not only condoned it, but had also used drugs with him in the past. The court was further concerned because mother knew that T.M. had used drugs since he was 12 years old and had unsuccessfully attempted rehabilitation numerous times; yet, she still allowed him to be around the child. The evidence showed that, on July 7, 2015, the social worker went to the residence and found T.M. alone with mother and the child. T.M. admitted to using methamphetamine three days earlier, and mother said she thought he used the week prior, as well. The evidence also showed that on July 15, 2015, mother accepted a "shotgun" from T.M. when he drew methamphetamine smoke and blew it into her mouth. The court further noted that there was no real assurance of T.M.'s sobriety or that he would stay away from the child. Ultimately, the court was very concerned that mother was still in a relationship

11

with T.M. and risked exposing the child to him, and that she admittedly continued to use methamphetamine after the birth of the child. There was substantial evidence to support the court's removal order.

Mother claims that the court failed to consider less drastic alternatives to removal. She contends that the court could have ordered her to participate in random and on-demand drug tests, a drug program (if she had any missed or positive tests), a 12-step program, and individual counseling. She also suggests the court could have required her to allow the social worker to have unannounced visits at her home, to have increased contact with the family to ensure that no unauthorized persons were in contact with the child, and to report any conditions the court wanted to be aware of to ensure the child was cared for. However, these alternatives would not have fully addressed the court's concerns. The evidence indicated that mother was either unable or unwilling to keep T.M. away from the child, despite his long-standing drug problem. Occasional visits from a social worker would not ensure that T.M. would stay away from his mother's home, where mother and the child resided. Furthermore, although mother suggests that the court could have ordered her to drug test or participate in a drug program and counseling, she overlooks the court's concerns with her health issues, including her short-term memory loss and epilepsy disorder. Mother's suggested alternatives also fail to address the court's concerns with her potentially unstable living arrangement with T.M.'s mother.

Mother additionally argues that the court's most recent visitation order, permitting unsupervised visits and giving the social worker the authority to permit overnight or weekend visits in the future, somehow showed that she would pose no risk to the child, if he stayed in her custody. However, the court only ordered mother to have a minimum of one unsupervised visit per month. There was certainly much less risk to the child if she had him one day per month, as opposed to having him 24 hours a day, seven days a week. Furthermore, although the court did authorize DPSS to permit overnight or weekend visits, it expressly warned that such visits were "not to occur until a social worker [was] satisfied that it [was] okay to do so." The court's clear intent was to not allow overnight visits immediately. Therefore, mother's claim that the court's visitation order reflected that she posed no risk to the child has no merit.

We conclude substantial evidence supports the juvenile court's dispositional findings and order removing the child from mother's custody.

## DISPOSITION

The court's order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
Acting P. J.

We concur:

CODRINGTON
J.

SLOUGH
J.

14